*The decision of the Board must be affirmed.*

**BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF NEW YORK et al., Appellants,**

v.

**Joseph A. CALIFANO, Jr., Secretary, United States Department of Health, Education and Welfare, et al., Appellees.**

Nos. 1121, 1414, Dockets 78–6083, 78–6088.

United States Court of Appeals, Second Circuit.

Argued May 26, 1978.

Decided Aug. 21, 1978.

Rosemary Carroll, Asst. Corp. Counsel, New York City (Allen G. Schwartz, Corp. Counsel of the City of New York, Leonard Koerner, Asst. Corp. Counsel, New York City, of counsel), for appellants.

Richard B. Caro, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty. for the Eastern District of New York, Brooklyn, N. Y., Harvey M. Stone, Rodger C. Field, Asst. U. S. Attys., Brooklyn, N. Y., of counsel), for appellees.

Before OAKES, Circuit Judge, and BLUMENFELD * and MEHRTENS,** District Judges.

OAKES, Circuit Judge:

Consolidated appeals raise the important question whether in passing upon applications for grants of Emergency School Aid Act (ESAA)[1] funds the Department of Health, Education and Welfare (HEW) must apply a constitutional standard of intentional discrimination as delineated by the Supreme Court[2] or whether the ESAA

---

* Of the District of Connecticut, sitting by designation.

** Of the Southern District of Florida, sitting by designation.

1. 20 U.S.C. §§ 1601–19.

2. *Dayton Bd. of Educ. v. Brinkman,* 433 U.S. 406, 413, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 268–69, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Keyes v. School Dist. Number One,* 413 U.S. 189, 201–03, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). These cases, interpreting the Fourteenth Amendment, hold that a "finding that the pupil population in the various [city, town or village] schools is not homogeneous, standing by itself, is not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions on the part of the Board." *Dayton, Bd. of Educ. v.*

*Brinkman, supra,* 433 U.S. at 413, 97 S.Ct. at 2772. Six members of the Supreme Court appear to be on record that this involves "[f]indings as to the motivations of multi-membered public bodies . . . ." *Id.* at 414, 97 S.Ct. at 2772. A seventh, Mr. Justice Stevens, while agreeing with this broad proposition, has expressed the qualification that such a finding "necessarily depends primarily on objective evidence concerning the effect of the Board's action, rather than the subjective motivation of one or more members of the Board . . . ." *Id.* at 421, 97 S.Ct. at 2776 (Stevens, J., concurring); *see Washington v. Davis, supra,* 426 U.S. at 253–54, 96 S.Ct. 2040 (Stevens, J., concurring). For an exhaustive discussion of impact and motive, *see* Eisenberg, *Disproportionate Impact and Illicit Motive: Theories of Constitutional Adjudication,* 52 N.Y.U.L.Rev. 36, 42–50, 99–105 (1977). *See also Arthur v. Nyquist,* 573 F.2d 134 (2d Cir.), *petition for cert. filed,* 47 U.S.L.W. 3010 (U.S. July 18, 1978).

as supplemented by HEW regulations permits application of a disproportionate impact standard of discrimination. Appellants are respectively the Board of Education of the City School District of the City of New York (the Central Board) and the Community School Board (CSB) of Community School District 11 (District 11).

The two school boards sued to enjoin HEW from holding them ineligible for ESAA assistance. The United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge,* initially upheld HEW's denial of ESAA funds. But upon the Central Board's motion for reargument, the district court vacated its prior decision and remanded the matter to HEW for "further consideration" to determine if the school boards' disqualification resulted from unconstitutional discrimination as well as from violations of the applicable regulations. After remand the district court affirmed HEW's conclusion that substantial evidence warranted a finding of both unconstitutional discrimination and discrimination in violation of the ESAA. Accordingly, it entered a final order granting judgment in favor of HEW. We affirm the

judgment on the basis that the standards of the statute and regulation have been satisfied.

## I. *Statutory Scheme*

On an annual basis, the ESAA provides special assistance to local educational agencies and other eligible organizations to achieve three basic statutory objectives:

(1) to meet the special needs incident to the elimination of minority group segregation and discrimination among students and faculty in elementary and secondary schools;

(2) encourage the voluntary elimination, reduction, or prevention of minority group isolation in elementary and secondary schools with substantial proportions of minority group students; and

(3) to aid school children in overcoming the educational disadvantages of minority group isolation.

20 U.S.C. § 1601(b). Thus, the ESAA is a program purposefully designed "to aid in desegregating schools and support quality integrated schools."[3]

---

**3.** S.Rep. No. 604, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S. Code Cong. & Admin. News, pp. 2595, 2600. Funds granted under the ESAA are apportioned on a numerical basis, on "the relative number of minority group children enrolled in the elementary and secondary schools of each State . . . ." *Id.* at 2601. An important congressional objective, incorporated in the statute itself, is "the elimination of minority group isolation to the maximum extent possible" in all the schools of a given district, *id.,* thereby seeking with federal funding to carry out the longstanding commands of *Brown v. Board of Educ.,* 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (segregation of children in public schools solely on the basis of race, even though the physical facilities and other tangible factors may be equal, deprives minority children of equal educational opportunities).

The House-Senate Conference Committee reported:

*Purpose.*—The House amendment stated the purpose of the title as providing *financial assistance to meet the special needs incident to desegregation* and *to encourage voluntary integration.* The Senate amendment stated the purpose as encouraging comprehensive planning for the elimination of minority

group isolation, as providing financial assistance to establish stable, quality, integrated schools, as assisting in eliminating minority group isolation, and as aiding schoolchildren in overcoming the educational disadvantages of minority group isolation. The conference substitute retains the House provision with the one addition of the Senate reference *to aiding schoolchildren in overcoming the educational disadvantages of minority group isolation.*

*Policy with respect to the application of certain provisions of federal law.*—The House amendment stated the policy of the United States that guidelines and criteria established pursuant to this title *shall be applied uniformly in all regions of the United States* in dealing with conditions of segregation by race in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation. The Senate amendment stated the policy of the United States that guidelines and criteria established pursuant to Title VI of the Civil Rights Act, section 182 of the Elementary and Secondary Education Amendments of 1966, and this title *shall be applied uniformly in all regions of the United States* in dealing with conditions of segregation by race

Each year that an application for ESAA assistance is submitted, the application is evaluated and the eligibility of the applicant reviewed. ESAA funds are awarded to qualified applicants in the order in which their applications are ranked. The ranking depends on compliance with specified guidelines and criteria, the most important being "objective" in nature. 45 C.F.R. § 185.-14(a), (b) & (c).[4] The ESAA program is competitive in nature since the amount appropriated by Congress is less than the total amount of the grants sought; only those

applications which meet ESAA objectives to the greatest extent possible are the ones which receive the awards. *Id.* § 185.-14(c)(4).

In addition to filing applications which are timely[5] and which meet the minimal technical/qualitative criteria, *see* 20 U.S.C. §§ 1605(a), 1606–09;[6] 45 C.F.R. § 185.14,[7] the applicant must establish that it has not engaged in any of the four disqualifying acts, practices, policies or procedures condemned by the statutes and regulations. 20 U.S.C. § 1605(d)(1);[8] 45 C.F.R. § 185.13(*1*).[9]

*whether de jure or de facto* in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation. The conference substitute retains both the Senate and House provisions but deletes the reference in the Senate amendment to this title. The conference substitute's version of the Senate provision, therefore, restates the policy contained in section 2(a) of Public Law 91–230 and in no way supercedes [*sic*] subsection (b) of such section.

Conf.Rep. No. 798, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S. Code Cong. & Admin. News, pp. 2608, 2662–63 (emphasis added). Thus, superimposed upon the underlying purposes of the ESAA is a requirement of uniform application throughout the country, irrespective of the origin or cause of segregation. This is expressed in 20 U.S.C. § 1602(a) as follows:

It is the policy of the United States that guidelines and criteria established pursuant to this chapter shall be applied uniformly in all regions of the United States in dealing with conditions of segregation by race in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation.

4. Eighty "points are awarded on the basis of 'objective criteria,' as follows: 30 points on the basis of 'need' as determined by the number and percentage of minority group children in the applicant's schools as compared to other school districts in the state; 50 points on the basis of 'the effective net reduction in minority group isolation' (in terms of the number and percentage of children affected) or, in the case of certain types of assistance applications, the "effective net prevention of minority group isolation." 45 C.F.R. § 185.14(a) (1977). In addition to points awarded for objective criteria, 45 "points" are awarded on the basis of (1) "needs assessment," (2) "statement of objectives," (3) "activities" (including specificity of project design, staffing, delivery of services, and parent

and community involvement), (4) "resource management" and (5) "evaluation." The point awards are determined by the Assistant Secretary who is authorized to seek expert assistance. *Id.* § 185.14(b). Criteria for funding include (1) program cost and (2) amount of funds available for assistance within the state in relation to other pending state applications. *Id.* § 185.14(c)(1). Fewer than 40 points under § 185.14(a) or 28 points under § 185.14(b) result in automatic denial (subject to resubmission). *Id.* § 185.14(c)(2) & (3). Section 185.-14(c)(4) and (5) establish the procedures for award of funds on the basis of application rank.

5. The Assistant Secretary specifies the times by which applications must be filed, 20 U.S.C. § 1609(e).

6. Some of the criteria are set forth in note 4 *supra.*

7. *See* note 4 *supra.*

8. 20 U.S.C. § 1605(d)(1) provides:

No educational agency shall be eligible for assistance under this chapter if it has, after June 23, 1972—

(A) transferred (directly or indirectly by gift, lease, loan, sale, or other means) real or personal property to, or made any services available to, any transferee which it knew or reasonably should have known to be a nonpublic school or school system (or any organization controlling, or intending to establish, such a school or school system) without prior determination that such nonpublic school or school system (i) is not operated on a racially segregated basis as an alternative for children seeking to avoid attendance in desegre-

9. See note 9 on p. 580.

The Assistant Secretary for Education may not approve the application unless it is determined by the Secretary that the applicant is not ineligible. *See* 20 U.S.C. § 1605(d)(4).[10] While the statute itself forbids discrimination in the hiring, promotion or assignment of teachers, note 8 *supra*, the pertinent regulation in this case is 45 C.F.R. § 185.43(b)(2).[11] In substance, the regulation makes ineligible for assistance an edu-

gated public schools, and (ii) does not otherwise practice, or permit to be practiced, discrimination on the basis of race, color, or national origin in the operations of any school activity;

(B) had in effect any practice, policy, or procedure which results in the disproportionate demotion or dismissal of instructional or other personnel from minority groups in conjunction with desegregation or the implementation of any plan or the conduct of any activity described in this section, *or otherwise engaged in discrimination based upon race,* color, or national origin *in the hiring, promotion, or assignment of employees of the agency* (or other personnel for whom the agency has any administrative responsibility);

(C) in conjunction with desegregation or the conduct of an activity described in this section, had in effect any procedure for the assignment of children to or within classes which results in the separation of minority group from nonminority group children for a substantial portion of the school day, except that this clause does not prohibit the use of bona fide ability grouping by a local educational agency as a standard pedagogical practice; or

(D) had in effect any other practice, policy, or procedure, such as limiting curricular or extracurricular activities (or participation therein by children) in order to avoid the participation of minority group children in such activities, which discriminates among children on the basis of race, color, or national origin;

except that, in the case of any local educational agency which is ineligible for assistance by reason of clause (A), (B), (C), or (D), such agency may make application for a waiver of ineligibility, which application shall specify the reason for its ineligibility, contain such information and assurances as the Secretary shall require by regulation in order to insure that any practice, policy, or procedure, or other activity resulting in the ineligibility has ceased to exist or occur and include such provisions as are necessary to insure that such activities do not reoccur after the submission of the application.

(Emphasis added.)

**9.** Section 185.13 provides in pertinent part:

Such application shall contain . . .

.    .    .    .    .

(2)(i) An assurance that the applicant has not had or maintained in effect prior to the date of its application for assistance under the Act, and will not have or maintain in effect subsequent to such date, any practice, policy, or procedure with respect to minority group personnel in violation of § 185.43(b) (or that if such a violation has occurred, application for a waiver of ineligibility has been made to the Secretary); and (ii) a statement of the number of principals, full-time classroom teachers, and athletics head coaches, by race, for the academic year immediately preceding (a) the year in which the applicant first implemented any portion of a plan for desegregation or for elimination or reduction of minority group isolation in its schools pursuant to an order of a Federal or State court or administrative agency, or (b) the year in which the applicant first implemented any portion of a plan or project described in § 185.11, whichever is earlier, and of the number of principals, full-time classroom teachers, and athletics head coaches, by race, as of the date of its application;

(3)(i) An assurance that the applicant has not had or maintained in effect prior to the date of its application for assistance under the Act, and will not have or maintain in effect subsequent to such date, any procedure for assignment of children to classes in violation of § 185.43(c) (or that if such a violation has occurred, application for a waiver of ineligibility has been made to the Secretary); and (ii) a statement of the total number of children assigned by the applicant as of the date of the application to all-minority or all-nonminority classes for more than 25 percent of the school day classroom periods, with an educational justification or explanation for any such assignments[.]

.    .    .    .    .

**10.** 20 U.S.C § 1605(d)(4) provides:

No application for assistance under this chapter shall be approved prior to a determination by the Secretary that the applicant is not ineligible by reason of this subsection.

**11.** 45 C.F.R. § 185.43(b)(2) provides:

No educational agency shall be eligible for assistance under the Act if, after June 23, 1972, it has had or maintained in effect any other practice, policy, or procedure which results in discrimination on the basis of race, color, or national origin in the recruiting, hiring, promotion, payment, demotion, dismissal, or assignment of any of its employees (or other personnel for which such agency has any administrative responsibility) . . ..

cational agency which after June 23, 1972, has utilized a procedure resulting, *inter alia,* in the discriminatory "assignment of full-time classroom teachers to the schools of such agency in such a manner as to identify any of such schools as intended for students of a particular race, color, or national origin." [12]

## II. *Underlying Facts*

Teaching and supervisory appointments to public schools in New York City are now and have traditionally been made by the Chancellor of the Central Board. High School teachers are appointed by the Chancellor from a list of eligible candidates.[13] The list of eligible candidates is prepared by the Board of Examiners, which ranks each candidate on the basis of a competitive examination.[14]

In 1969 the New York City school system was "decentralized" and thirty-two separate community school districts (CSDs) were established. Each CSD was vested

---

**12.** *Id.* Only the Secretary of HEW himself may grant waivers of the disqualifying practices. *See* 20 U.S.C. § 1605(d)(1), (2) & (3).

**13.** (a) The chancellor shall appoint and assign teachers for all schools and programs under the jurisdiction of the city board from persons on competitive eligible lists.

(b) The chancellor shall appoint and assign all supervisory personnel for all schools and programs under the jurisdiction of the city board from persons on qualifying eligible lists.

(c) Each community board shall appoint teachers for all schools and programs under its jurisdiction who are assigned to the district by the chancellor from competitive eligible lists. Insofar as practicable the chancellor, when making such assignments shall give effect to the requests for assignment of specific persons by the community board. The community board shall appoint such teachers to schools within such district within thirty days if such appointment is to be effective on a date subsequent thereto and within three days if such appointment is to become effective immediately. . . .
N.Y.Educ.Law § 2590–j(4)(a)–(c) (McKinney 1970).

**14.** 3.(a)(1) The board of examiners shall prepare and administer objective examinations to determine the merit and fitness of all candidates for teaching and supervisory service positions, other than the positions of chancellor, executive deputy city superintendent, deputy city superintendent, assistant city superintendent and community superintendent. Examinations for teaching positions may consist in part of the National Teachers Examination administered by the Educational Testing Service of Princeton, New Jersey.

(b)(1) Examinations for teaching positions shall be open competitive.
(2) Examinations for all supervisory service positions shall be open qualifying.

(3) The board of examiners may establish an eligible list for any class of positions for which it finds inadequate numbers of qualified persons available for recruitment. Such *examination shall, so far as practicable,* be constructed and rated so as to be equivalent. Candidates who pass any such examination and who are otherwise qualified shall be placed on such list in the rank corresponding to their grade. . . .

(c) All lists of eligibles for supervisory or administrative positions which are in existence and which were placed in abeyance, and appointments from which were prohibited by a temporary restraining order of the United States District Court on the twenty-third day of July nineteen hundred seventy-one, or the preliminary injunction of the said court dated September seventeenth, nineteen hundred seventy-one, continuing such prohibition, and of which lists those that are scheduled to expire prior to March first, nineteen hundred seventy-five shall be deemed extended to March first, nineteen hundred seventy-five, as though such were the date on which such lists were originally scheduled to terminate or expire.
*Id.* § 2590–j(3) (McKinney Supp.1977). Reference in subparagraph (c) is presumably to the litigation in *Chance v. Board of Examiners,* 330 F.Supp. 203 (S.D.N.Y.1971), *aff'd,* 458 F.2d 1167 (2d Cir. 1972) (preliminary injunctive relief upheld). *See generally Chance v. Board of Examiners,* 561 F.2d 1079 (2d Cir. 1977); *Chance v. Board of Examiners,* 534 F.2d 993 (2d Cir. 1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977); *Chance v. Board of Educ.,* 496 F.2d 820 (2d Cir. 1974).

New York City and Buffalo, we are informed, are the only New York school districts which administer local teacher examinations in addition to the state licensing requirements. Buffalo's procedures have also been the subject of litigation. *Arthur v. Nyquist, supra.*

with primary authority over the operation of the elementary and junior high schools within its district.[15] Although the Chancellor alone appoints high school teachers, elementary and junior high school teachers may be appointed in either of two ways. One of these is the traditional method of assignment by the Chancellor. The community school boards must abide by the Chancellor's designation.[16] However, the Chancellor "insofar as practicable . . . shall give effect to the requests for assignment of specific persons by the community board.[17] An alternative method is available for use only in those elementary and junior high schools whose students rank in the lower 45% on a comprehensive reading examination which is administered annually to students in schools within the jurisdiction of the local community districts.[18] The community school districts may directly appoint teachers to such "45% schools" if the individual has passed either a qualifying examination prepared by the Board of Examiners or the National Teachers Examination.[19]

Irrespective of how the teachers are appointed, ultimate control still remains with the Chancellor. He retains the power to rescind illegal teacher assignments and to compel a local board's compliance with all applicable provisions of law.[20] In addition, he is vested with all powers and duties of the superintendent of schools of the city district[21] which include "the power to transfer teachers from one school to another."[22]

15. Each community board shall have all the powers and duties, vested by law in, or duly delegated to, the local school board districts and the board of education of the city district on the effective date of this article, not inconsistent with the provisions of this article and the policies established by the city board, with respect to the control and operation of all pre-kindergarten, nursery, kindergarten, elementary, intermediate and junior high schools and programs in connection therewith in the community district. N.Y.Educ.Law § 2590–e (McKinney Supp. 1977).

16. *See id.* § 2590–j(4)(c) (McKinney 1970), *quoted in* note 13 *supra.*

17. *Id.*

18. The chancellor shall cause a comprehensive reading examination to be administered to all pupils in all schools under the jurisdiction of the community districts annually. Prior to October first of every year each school shall be ranked in order of the percentage of pupils reading at or above grade level as determined by such examination, in accordance with rules to be promulgated by the chancellor. *Id.* § 2590–j(5)(a) (McKinney Supp.1977).

19. The board of each eligible school may . . appoint any person a teacher in such school . . . without regard to any competitive eligibility lists ; . . . provided that such person, will . . . have the education and experience qualifications for certification as a teacher . . . and shall have:

(i) passed a qualifying examination to be prepared and administered by the board of examiners, . . . or be on an existing competitive eligible list for such position; or
(ii) passed the National Teachers Examination within the past four years at a pass mark equivalent to the average pass mark required of teachers during the prior year by the five largest cities in the United States which use the National Teachers Examination as a qualification, as determined by the chancellor. *Id.* § 2590–j(5)(c) (McKinney 1970).

20. 1. If, in the judgment of the chancellor any community board fails to comply with any applicable provisions of law, by-laws, rules or regulations, directives and agreements, and after efforts at conciliation with such community board have failed, he may issue an order requiring the community board to cease its improper conduct or to take required action and consistent with the provisions of this article and the educational and operational policies of the city board, may enforce that order by the use of appropriate means, including:

(a) supersession of the community board by the chancellor or a trustee appointed by him with respect to those powers and duties of such community board deemed necessary to ensure compliance with the order; and
(b) suspension or removal of the community board or any member or members thereof. *Id.* § 2590–l.

21. *Id.* § 2590–h (McKinney Supp.1970).

22. The superintendent of schools of a city shall possess, subject to the by-laws of the

The ESAA applications here at issue were for grants in the 1977–78 school year. *See* note 34 *infra.* To analyze whether there was compliance with the statute and regulations, HEW used 1975–76 data. Racial and ethnic statistics [23] demonstrated that in school year 1975–76 62.6% of high school students were minority students whereas 8.2% of high school teachers were minority teachers.[24] Seventy per cent of minority high school teachers were assigned to high schools in which minority student enrollment exceeded 70%, even though these high schools employed only 48% of the system's high school teachers. Conversely, in high schools in which there were propor-

tionately a low number of minority teachers, minority student enrollments were below 40%.[25]

Similar correlations between the racial/ethnic composition of the faculty of community school districts and the racial/ethnic composition of the student bodies within those school districts exist. For the same school year, 14.3% of the teachers and 69.7% of the students in elementary schools were minority, and 16.7% of the teachers and 70.1% of the junior high school students were minority. Quite clearly, the schools with minority student enrollments over 90% identifiably had the highest percentage of minority faculty by a substantial

board of education, the following powers and be charged with the following duties:

.   .   .   .   .

6. To have supervision and direction of associate, assistant, district and other superintendents, directors, supervisors, principals, teachers, lecturers, medical inspectors, nurses, auditors, attendance officers, janitors and other persons employed in the management of the schools or the other educational activities of the city authorized by this chapter and under the direction and management of the board of education; to transfer teachers from one school to another, or from one grade of the course of study to another grade in such course, and to report immediately such transfers to said board for its consideration and action; to report to said board of education violations of regulations and cases of insubordination, and to suspend an associate, assistant, district or other superintendent, director, supervisor, expert, principal, teacher or other employee until the next regular meeting of the board, when all facts relating to the case shall be submitted to the board for its consideration and action.
*Id.* § 2566–6 (McKinney 1970).

23. An injunction against the collection of such racial data has been sought in a related action. *Caulfield v. Board of Educ.*, 583 F.2d 605 (2d Cir. 1978).

24. In the case of District 11 in 1975–76, 11.2% of its elementary school teachers and 63.9% of its elementary school students were members of minority groups.

25. The high schools with proportionately a high or low number of minority teachers are as follows:

| High Schools With Minority Student Enrollments Over 90% | | % Minority Teachers |
|---|---|---|
| Harlem | 100% | 70.0% |
| Ben Franklin | 98.3 | 27.9 |
| Park East | 93.8 | 40.0 |
| Harlem Prep | 98.4 | 69.2 |
| Lower East Side | 100 | 63.2 |
| M. L. King, Jr. | 96.0 | 25.0 |
| Satellite Acad. | 92.7 | 25.0 |
| Jane Addams | 98.7 | 34.3 |
| Boys & Girls | 99.9 | 20.9 |
| Eastern District | 97.0 | 18.0 |
| Bushwick | 94.2 | 20.4 |
| Pacific | 99.8 | 37.5 |
| Redirection | 97.7 | 47.6 |
| August Martin | 97.6 | 16.7 |

| High Schools With Minority Student Enrollments Under 40% | | % Minority Teachers |
|---|---|---|
| Stuyvesant | 31.0% | 2.8% |
| Bronx H.S. of Science | 31.3 | 2.8 |
| Lafayette | 29.2 | 0.6 |
| Midwood | 32.6 | 1.7 |
| Abraham Lincoln | 37.0 | 0.7 |
| James Madison | 35.6 | 0.9 |
| New Utrecht | 22.5 | 0.0 |
| Fort Hamilton | 30.0 | 3.7 |
| Sheepshead Bay | 32.5 | 3.7 |
| F.D. Roosevelt | 29.4 | 1.8 |
| South Shore | 36.9 | 2.4 |
| William Grady | 22.2 | 0.0 |
| Benjamin Cardoza | 38.5 | 3.2 |
| Francis Lewis | 36.9 | 1.7 |
| Forest Hills | 38.8 | 0.8 |
| Long Island City | 30.2 | 2.8 |
| Richmond Hill | 28.5 | 3.4 |
| Bayside | 30.4 | 1.3 |
| New Dorp | 4.3 | 0.0 |
| Curtis | 32.1 | 3.0 |
| Tottenville | 3.7 | 1.9 |
| Susan E. Wagner | 13.0 | 2.5 |
| Ralph McKee | 19.1 | 3.1 |

margin.[26] Similarly, community school districts with minority student enrollments under 50% contained a disproportionately low percentage of minority faculty.[27]

Upon the "remand" to HEW, HEW found that the racial assignment of faculty in the central school district was, as HEW put it, "strikingly illustrated by the absence of minority teachers" at certain academic, i.e., nonvocational high schools. Ten of these were demonstrated to have a disproportionately low number of full-time minority teachers in the 1975–76 school year. All ten of these schools were among the thirteen academic high schools[28] with full-time faculties having a percentage of black teachers at or below two standard deviations,[29] which was 1.2%; the mean of full- /

26. CSDs With Minority Student Enrollments Over 90%

| | % Minority Student Enrollments Over 90% | % Minority Teachers |
|---|---|---|
| CSD # 1 | 93.6% | 10.4% |
| 4 | 98.8 | 24.6 |
| 5 | 99.2 | 56.7 |
| 7 | 99.0 | 27.9 |
| 9 | 97.7 | 26.9 |
| 12 | 98.3 | 26.7 |
| 13 | 97.0 | 34.7 |
| 14 | 90.3 | 14.6 |
| 16 | 99.6 | 39.0 |
| 17 | 96.1 | 16.8 |
| 19 | 91.5 | 12.2 |
| 23 | 99.6 | 30.0 |

27. CSDs With Minority Student Enrollments Under 50%

| | % Minority Student Enrollments Under 50% | % Minority Faculty |
|---|---|---|
| CSD 20 | 31.5 | 0.4% |
| 21 | 34.9 | 2.5 |
| 22 | 29.1 | 1.7 |
| 24 | 44.0 | 5.9 |
| 25 | 29.5 | 2.6 |
| 26 | 25.8 | 2.7 |
| 27 | 48.4 | 7.3 |
| 30 | 48.8 | 6.2 |
| 31 | 16.3 | 3.1 |

Other information indicates that ten of the 32 CSDs in New York City employ minority faculty members in excess of 20%. Those CSDs have minority student enrollments varying from 86.7 to 99.6 percent.

28.

| Academic High Schools | % black | Total teachers |
|---|---|---|
| Stuyvesant | .9 | 109 |
| Lafayette | .6 | 166 |
| Midwood | .9 | 115 |
| Abraham Lincoln | .7 | 137 |
| James Madison | .9 | 117 |
| New Utrecht | 0.0 | 163 |
| Fort Hamilton | .6 | 163 |
| F. D. Roosevelt | 1.2 | 169 |
| Beach Channel | .7 | 137 |
| Francis Lewis | .8 | 121 |
| Forest Hills | 0.0 | 125 |
| Bayside | .7 | 150 |
| New Dorp | 0.0 | 105 |

29. In Castaneda v. Partida, 430 U.S. 482, 496–97 & n.17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), a grand jury discrimination case, the Court adopted a statistical methodology used in the social sciences for the prediction of fluctuations from an expected value, known as the standard deviation, defined for the binomial distribution as the square root of the product of the total number in the sample (n) times the probability of selecting a minority (p) times the probability of selecting a non-minority (q), thus $\sqrt{npq}$. To express the standard deviation in proportionate terms, the formula is $\sqrt{\frac{pq}{n}}$. The statistical approach was also utilized by the Court in a school segregation case, Hazelwood School Dist. v. United States, 433 U.S. 299, 308–09 & n.14, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977):

A precise method of measuring the significance of such statistical disparities was explained in Castaneda v. Partida, 430 U.S. 482, 496–497, n.17, [97 S.Ct. 1272, 51 L.Ed.2d 498]. It involves calculation of the "standard deviation" as a measure of predicted fluctuations from the expected value of a sample. Using the 5.7% figure as the basis for calculating the expected value, the expected number of Negroes on the Hazelwood teaching staff would be roughly 63 in 1972–1973 and 70 in 1973–1974. The observed number in those years was 16 and 22, respectively. The difference between the observed and expected values was more than six standard deviations in 1972–1973 and more than five standard deviations in 1973–1974. The Court in Castaneda noted that "[a]s a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations," then the hypothesis that teachers were hired without regard to race would be suspect. 430 U.S., at 497 n.17 [97 S.Ct. 1272].

See id. at 311–12 n.17, 97 S.Ct. 1272. In this case the standard deviation is 1.94% above or below 5.1%, or p, since the average size of academic high school faculties is 128 teachers, and 94.9% is the non-black force of teachers at those schools. The square root of $\sqrt{\frac{pq}{n}}$ is 1.94%. Thus, in reference to the schools listed in note 28 supra, all have a standard deviation of two or more: 5.1% (minority teachers in all academic high schools) minus 1.94% (one deviation), 1.94% (a second deviation) = 1.2%. If

time black teachers in academic high schools systemwide was then 5.2%.

To take another example for the same school year, 8.2% of academic high school teachers in the Central Board's employ were members of minority groups, black or Hispanic. Lafayette High School, for one, with a total of 166 teachers had only one minority teacher, even though it could have been expected based on systemwide statistics to have had fourteen minority teachers. Lafayette's proportion of minority students was 29.2%.[30] In contrast, for the same year Boys High School in Brooklyn had more than two and one-half times the number of full-time minority teachers than the expected rate; its student body was 99.9% minority.[31]

These substantial disproportions are not contested by the appellants, nor do they deny that the schools were statistically "racially identifiable" as a result of the significant disparities in staff assignments. The claim pressed below and on this appeal has been limited to the argument that the statute and regulation must be construed to require HEW to establish that the disparities resulted from purposeful or intentional discrimination in the constitutional sense. See note 2 supra.

### III. Proceedings Before HEW and the District Court

Only one of the Central Board's three basic grant applications survived program merit competition and obtained a sufficient rank order standing to be considered for funding.[32] On November 9, 1976, the Of-

30. the same calculations are made for the schools referred to in note 28 supra with respect to minorities in the teaching population systemwide (8.2%), the difference between the expected percentage of minority teachers to the actual percentage is of course higher. In the case of Lafayette, it would exceed three standard deviations.

30.

HIGH SCHOOL LAFAYETTE (BROOKLYN)

| School Year | Total Full Time Teachers | Expected Percent of Minority Teachers | Expected Number of Minority Teachers | Actual Number of Minority Teachers | Percent of Actual To Expected Number of Minority Teachers | Ratio of Expected To Actual Number of Minority Teachers | Persent [sic] of Minority Students |
|---|---|---|---|---|---|---|---|
| | | | | | | Extent of Deviation | |
| 1971–72 | 241 | 6.4% | 15 | 1 | 6.7% | 15:1 | 20.1% |
| 1972–73 | 216 | 6.6% | 14 | 1 | 7.1% | 14:1 | 23.9% |
| 1973–74 | 219 | 7.2% | 16 | 1 | 6.2% | 16:1 | 25.6% |
| 1974–75 | 196 | 7.7% | 15 | 1 | 6.7% | 15:1 | 27.8% |
| 1975–76 | 166 | 8.2% | 14 | 1 | 7.1% | 14:1 | 29.2% |

31. At least four schools within District 11 were racially identifiable. In two schools with less than 40% minority students, there were 3.4% minority teachers in one and none in the second. In two schools with minority student concentrations over 92%, there were 29.8% and 24.1% minority teachers. Data for 1977–78 reveal both a slight improvement and a substantial regression. While HEW removed one school from its unsatisfactory list, the other three remained racially identifiable and three additional schools were deemed in violation of ESAA criteria.

32. The Central Board and various community school districts in the city filed a total of 32 applications for basic grounds, pilot project grants and bilingual project grants under the ESAA. Of the 32, 20 ultimately demonstrated sufficient program merit to warrant approval in competition with other applications; 3 were above minimum program quality, but were not

fice for Civil Rights at HEW wrote to Chancellor Anker that it found that teachers, principals and assistant principals were assigned "in a manner that has created, confirmed and reinforced the racial and/or ethnic identifiability of the system's schools . . . ." [33] By letter dated July 1, 1977, HEW notified the Central Board and District 11 that their grant applications could not be funded because they did not estab-

lish their eligibility under 45 C.F.R. § 185.-43(b)(2).[34] Thereafter, HEW afforded an opportunity to the Central School Board and to District 11 to achieve voluntary resolution and compliance under 42 U.S.C. § 2000d–1,[35] 45 C.F.R. § 80.7(d).[36] *See Brown v. Weinberger,* 417 F.Supp. 1215, 1221 (D.D.C.1976). On September 7, 1977, the Central Board and OCR entered into a Memorandum of Understanding. In that

successful in competing with other applicants; and 9 applications were not minimally acceptable. The 20 applications that warranted approval initially could not be funded because all New York City applicants were disqualified under § 1605(d) of the Act. However, all applicants except the Central Board and CSDs 10 and 11 were able to establish their eligibility with the assistance and advice of the Office for Civil Rights either by providing additional material at show cause meetings pursuant to 45 C.F.R. § 185.46(a)(2) or by taking corrective action and filing successful applications for waivers of ineligibility. The federal defendants were thus able to provide $13,509,079 in ESAA grants to eligible New York City community school districts for the 1977–78 school year. The basic grant total awarded New York City applicants comprises approximately 65% of the basic grants awarded to New York State.

The three New York City applicants unable to establish their eligibility did not take the necessary corrective action to obtain waivers of ineligibility. CSD 10 did not sue to challenge the denial of its ESAA application, but CSD 11 ($298,891) and the Central Board ($3,559,132) did sue. Thus the only plaintiffs in this action which have not received funds for which they applied are the Central Board and CSD 11. Essentially CSD 11's application stands or falls with the Central Board's.

**33.** By letter dated January 18, 1977, to Chancellor Anker OCR concluded that the Central Board had unlawfully failed to make available equal educational services to minority children. These preliminary findings were revised by a letter dated October 4, 1977, and became the subject of formal administrative adjudicatory hearings in accordance with 42 U.S.C. § 2000d–1 and 45 C.F.R. § 80.8. The October 4, 1977, OCR letter stated, among other things, that students were being assigned in racially identifiable or isolated instructional settings in violation of Title VI. While this finding would also constitute a ground for ineligibility under ESAA, 20 U.S.C. § 1605(d)(1)(C)–(D); 45 C.F.R. § 185.43(c)–(d), the Central Board and HEW have settled their differences and entered into a Letter of Agreement.

**34.** The regulation is quoted in part in note 11, *supra* and in part in text accompanying note 12

*supra.* On June 20, 1978, HEW disapproved the Central Board's 1977–78 ESAA application.

**35.** 42 U.S.C. § 2000d–1 provides in part:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract . . . is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. . . . Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient . . . or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement *and has determined that compliance cannot be secured by voluntary means.* In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.
(Emphasis added.)

**36.** If an investigation pursuant to paragraph (c) of this section indicates a failure to comply with this part, the responsible Department official or his designee will so inform the recipient and the matter will be resolved by informal means whenever possible. If it has been determined that the matter cannot be resolved by informal means, action will be taken as provided for in § 80.8.

45 C.F.R. § 80.7(d)(1) (1977).

Memorandum, the Central Board agreed to assign or reassign teachers to comply with federal standards by 1980. This agreement was subsequently vacated by Judge Weinstein by order dated March 15, 1978, in a related proceeding sub judice before this court. *Caulfield v. Board of Education,* No. 78–6035 (2d Cir. filed Feb. 28, 1978).

Neither the Central Board nor District 11 contested the accuracy or the sufficiency of the Government's data and statistics but rather presented explanations to justify the disparities. Appellants contended, ultimately to no avail, that they had not intentionally discriminated. Rather, they argued that disparate assignments resulted from the state education law, from the requirements of collective bargaining agreements, and from demographic changes and other alleged "neutral factors," including the wishes of black principals and the desires of individual parent-teacher associations and of the black and white communities.

On September 27, 1977, the Central Board and District 11 filed a complaint in the district court. The district court reviewed the administrative record and, after a hearing, not only denied the Central Board's motion for summary judgment, but granted the defendants' cross-motion for summary judgment affirming the denial of ESAA funds. As previously stated, however, the district court vacated its prior decision and remanded the matter to HEW for further consideration in light of constitutional criteria.

Thereafter, HEW determined that the City School District discriminated on a racial basis in the assignment of teachers and maintained an illegally segregated system in violation of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964, and the requirements of ESAA. It also determined that after June 23, 1972, the Central

Board took no effective steps to desegregate the system. While the Central Board was given an opportunity to rebut the statistical prima facie case of discrimination, its explanations were not persuasive. HEW, therefore, held that the assignment of minority teachers could have "come about only through foreseeable acts of discrimination."

Similarly HEW determined that District 11 was ineligible for ESAA funds for having discriminated in its teacher assignments on the basis of race, color or national origin. HEW also found District 11's explanations inadequate.

Upon review of the administrative record and the submissions by the Central Board and District 11 and after argument, the district court affirmed the findings and conclusions of HEW as supported by substantial evidence and entered its order granting judgment from which these appeals are taken.

## IV. *Discussion*

### A. *Constitutional Standard versus Impact Standard.*

■ The principal argument raised by appellants is that in evaluating the distribution of teachers throughout the New York City schools HEW should have employed the constitutional test of intentional discrimination. *See* note 2 & accompanying text *supra.* To find a violation of the Fourteenth Amendment, the constitutional standard requires a showing not only of disparate impact, but also of illicit motive. *See* Eisenberg, *Disproportionate Impact and Illicit Motive: Theories of Constitutional Adjudication,* 52 N.Y.U.L.Rev. 36, 39 (1977).[37]

■ While appellants argue that HEW's decision to deny ESAA funds relies solely on statistical evidence of disparate impact,

---

**37.** Proof of "intentionally segregative actions on the part of the [school] Board," *Dayton Bd. of Educ. v. Brinkman, supra,* 433 U.S. at 413, 97 S.Ct. at 2772, can be presumed when the actions taken by the Board as a whole have the natural, probable and foreseeable result of increasing or perpetuating segregation. *See Arthur v. Nyquist, supra,* 573 F.2d at 142. *Ny-*

*quist* approved the intentional segregation standard of *Oliver v. Michigan State Bd. of Educ.,* 508 F.2d 178 (6th Cir. 1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). *See* Note, *Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction,* 86 Yale L.J. 317, 332–43 (1976).

contrary to Supreme Court cases construing the Fourteenth Amendment, we need not reach the question whether the evidence supports a finding of purposive segregative intent. Because we are dealing with an act of Congress, as amplified by HEW regulations, and not with a judicial determination whether certain acts have produced a Fourteenth Amendment violation, it is permissible for Congress to establish a higher standard, more protective of minority rights, than constitutional minimums require.[38] For example, Title VII cases have not required proof of discriminatory motive, at least where the employer is unable to demonstrate that requirements causing a disparate impact are sufficiently related to the job. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[39]

Here, Congress intended to permit grant disqualification not only for purposeful discrimination but also for discrimination evidenced simply by an unjustified disparity in staff assignments. This conclusion seems clear from the statute which expressly requires that all ESAA "guidelines and criteria . . . be applied uniformly . . . without regard to the

---

**38.** Alternatively this case may be analyzed as an exercise of congressional spending power. Congress has not prohibited discrimination in schools generally under its Fourteenth Amendment Section 5 powers, but has simply attached strings on grants of federal funds. *See Lau v. Nichols*, 414 U.S. 563, 569, 94 S.Ct. 786, 789, 31 L.Ed.2d 1 (1974):

> "Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination."

(Quoting Senator Humphrey.) But "simple justice" aside, an exercise of the congressional spending power, here in aid of the Fourteenth Amendment, is afforded considerable latitude, *see Oklahoma v. United States Civil Serv. Comm'n*, 330 U.S. 127, 67 S.Ct. 544, 91 L.Ed. 794 (1947); *Steward Machine Co. v. Davis*, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937), provided that Congress has not imposed unconstitutional conditions on the recipients of its appropriations.

The doctrine of "unconstitutional conditions" is not applicable in the present context. That doctrine provides that "government may not condition the receipt of its benefits upon the nonassertion of constitutional rights even if receipt of such benefits is in all other respects a 'mere privilege.'" L. Tribe, *American Constitutional Law* § 10–8, at 510 (1978); *see Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (state may not deny unemployment benefits to persons unwilling to work on Saturdays for religious reasons). No such condition appears here, unless it is the nonassertion of the "right" to have "disparate impact" alone not trigger fund-grant denial. But in the exercise of its spending power Congress may be more protective of given minorities than the Equal Protection Clause itself requires, although the point at which given non-minorities or their members are themselves unconstitutionally prejudiced remains in doubt even after *Bakke*. Still, in the alleviation of discrimination, the effect of congressional findings is not insubstantial. *E. g., Regents of the University of California v. Bakke*, —— U.S. ——, —————, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J.); *id.* at ——————, 98 S.Ct. 2733 (Brennan, J.); *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977).

**39.** *See Regents of the University of California v. Bakke, supra*, —— U.S. at ——, 98 S.Ct. 2733, 2758 n.44 (Powell, J.). In considering the opinion of Justices Brennan, White, Marshall and Blackmun, *id.* at ——, 98 S.Ct. 2733, Mr. Justice Powell suggests that the other Justices are wrong "when they suggest that 'disparate impact' alone is sufficient to establish" a Title VII violation. *Id.* at ——, 98 S.Ct. at 2758 n.44. But Justice Brennan's opinion appears to us to have a slightly different nuance from what Justice Powell attributes to it. Justice Brennan states that the Supreme Court's Title VII cases have sustained a statutory violation "even without a requirement of findings of intentional racial discrimination by those required or authorized to accord preferential treatment," *id.* at ——, 98 S.Ct. at 2787, and "have held under Title VII that where employment requirements have a disproportionate impact upon racial minorities they constitute a statutory violation, even in the absence of discriminatory intent, unless the employer is able to demonstrate that the requirements are sufficiently related to the needs of the job." *Id.* at ——, 98 S.Ct. at 2780 (footnote omitted). The debate, then, would seem to turn on whether in all cases where the employment requirements are insufficiently related to the job there is necessarily discriminatory intent.

origin or cause of such segregation." 20 U.S.C. § 1602(a). Moreover, the ESAA proscription against employment discrimination forbids discriminatory acts and practices which violate statutory civil rights provisions such as Title VI of the Civil Rights Act of 1964.[40] It is significant that Title VI findings of discrimination may be predicated on disparate impact without proof of unlawful intent. *See Lau v. Nichols,* 414 U.S. 563, 568, 94 S.Ct. 786, 789, 31 L.Ed.2d 1 (1974) ("[d]iscrimination is barred which has [disparate] *effect* even though no purposeful design is present . . . .") (emphasis in original); *Wade v. Mississippi Cooperative Extension Service,* 528 F.2d 508, 516–17 (5th Cir. 1976) ("statistical evidence alone may enable . . . plaintiffs to satisfy their initial burden of showing discrimination"); *cf. Griggs v. Duke Power Co., supra,* 401 U.S. at 432, 91 S.Ct. 849 (Title VII).

To effectuate the disparate impact test mandated by the ESAA, HEW regulations condition eligibility for ESAA funds upon teacher assignment patterns which do not identify schools "as intended for students of a particular race or national origin." 45 C.F.R. § 185.43(b)(2); *see ante* at p. 4522. The regulation appears consistent with the statutory purposes of ESAA and must be approved by the court if it is "reasonably related to the purposes of the enabling legislation." *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973) (quoting *Thorpe v. Housing Authority,* 393 U.S. 268, 280–81, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969)).

B. *Application of Disparate Impact Standard.*

HEW's decision that teacher assignment disparities warranted a denial of ESAA funds was not arbitrary or capricious. 5 U.S.C. § 706(2)(A). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Even if the appropriate standard of review were the "substantial evidence" test, the Secretary's denial must be affirmed since the data which we have reviewed above clearly support HEW's determination. It, therefore, follows a fortiori that the evidence precludes a finding of arbitrariness or caprice.

In disregarding "the origin or cause of segregation," 20 U.S.C. § 1602(a), HEW determined that the Central Board failed to present a sufficient justification for the racial disparities in teacher and staff assignments. The proffered justifications for the substantial disparities in the predominantly ten nonminority academic high schools included (1) restrictions on the transfer of teachers written into the collective bargaining agreement, (2) the desirability of teaching assignments in those schools, (3) the unwillingness of many nonminority teachers to teach in predominantly minority schools and (4) the unequal distribution of licenses in specific areas. None of these explanations is adequate to justify the racial disparities in staff assignments. The unequal distribution of licenses resulted from the very examinations which OCR previously determined had produced a racially significant disparate impact. *See* note 14 *supra.* Leaving aside whether the remaining justifications are sufficient as a matter of law, they have not been supported by adduced facts appearing on the record.

In sum, our holding rests on both a congressionally mandated disparate impact test and nonarbitrary administrative findings of discrimination. *See Regents of the University of California v. Bakke,* —— U.S. ——, ——, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J.); *id.* at —— & n.42, 98 S.Ct. 2756 (Brennan, J.). Thus, the extent of the

---

**40.** It is the policy of the United States that guidelines and criteria established pursuant to title VI of the Civil Rights Act of 1964 and section 182 of the Elementary and Secondary Education Amendments of 1966 shall be applied uniformly in all regions of the United States in dealing with conditions of segregation by race whether de jure or de facto in the schools of the local educational agencies of any State without regard to the origin or cause of such segregation.

20 U.S.C. § 1602(b).

injury has been defined and the consequent remedy, here the denial of funds, specified. *See International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 347–48, 371–72, 97 S.Ct. 1843; *United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 155–57, 167–68, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 762–70, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The district court's remand to HEW was, therefore, erroneous, though immaterial here.

The judgment is affirmed, although on grounds different from those expressed by the district court.

Oakes, Circuit Judge, concurred and filed opinion.